## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| In Re: Dividend Solar Finance, LLC, and Fifth Third Bank Sales and Lending Practices Litigation<br><br>This Document Relates to: ALL ACTIONS | MDL No. 24-3128 (KMM/DTS)<br><br>**ORDER ON FIFTH THIRD BANK'S FIRST MOTION TO DISMISS** |

The Judicial Panel on Multidistrict Litigation transferred this multidistrict proceeding to the undersigned on October 7, 2024. On February 7, 2025, the plaintiffs filed a Master Complaint setting forth class action and individual claims under the Truth in Lending Act ("TILA"), the Racketeer Influenced and Corrupt Organizations Act ("RICO"), various consumer protection statutes from the named Plaintiffs' home states, and state common law. Master Compl. ("MCC"), Dkt. 121.[1] Following input from the parties, the Court adopted a bifurcated schedule on the filing and consideration of motions to dismiss. Consistent with MDL Order No. 6 (Dkt. 134), defendant Fifth Third Bank, N.A. filed its First Motion to Dismiss on April 18, 2025, arguing that plaintiffs failed to state a claim under TILA, RICO, or for fraud. First MTD, Dkt. 148; Defs.' Mem., Dkt. 150. Following completion of briefing on the motion to dismiss, the Court heard oral argument on July 9, 2025. As explained below, the motion is granted in part and denied in part.

---

[1] Unless otherwise indicated, all record citations are to the docket in the main MDL file—No. 24-md-3128 (KMM/DTS).

## BACKGROUND[2]

In recent years, there has been a dramatic rise in the sale of rooftop solar panel systems for residential homes. MCC ¶¶ 2, 96. The increase followed the creation of tax incentives like the federal Residential Clean Energy Credit, which was introduced in 2005 and provides a credit of up to 30% of the cost of the solar panel installation, including financing costs. MCC ¶¶ 97–98. Several aspects of this growing area of business have led to government investigations, including the alleged use of high-pressure and deceptive sales tactics by businesses that sell and install the systems, misrepresentations about the availability of tax credits, and over-promising how much consumers can save on energy costs if they purchase a solar panel system. MCC ¶¶ 98–101. This MDL involves similar allegations of installer misconduct, but it also concerns the lending practices of Defendants Dividend Solar Finance, LLC and Fifth Third Bank, N.A. (together "Dividend" or the "Dividend Defendants").[3]

The Dividend Defendants are "primary players in the fast-growing residential solar industry," providing financing for the purchase and installation of the solar panels on residential rooftops. MCC ¶¶ 4, 102. To offer its loans to consumers, Dividend partners with other companies to sell and install solar panel systems. Those seller/installers market the systems to residents through door-to-door sales efforts. MCC ¶¶ 5, 104–05. The installers integrate Dividend's loans into their sales proposals, and their salespersons can access the Dividend platform through a tablet

---

[2] Because Fifth Third seeks dismissal of the TILA, fraud, and RICO claims under Fed. R. Civ. P. 12(b)(6), the Court takes the factual allegations in the Master Complaint as true.

[3] As alleged in the Master Complaint, Fifth Third acquired Dividend Solar Finance LLC in May 2022. MCC ¶ 82. The available information shows that Dividend Solar Finance LLC merged with Fifth Third in August 2023, and as a result of the merger, Dividend Solar Finance LLC ceased to have a separate legal existence and became a division of Fifth Third. *See State of Minn. v. GoodLeap, LLC*, No. 24-cv-1181 (KMM/DTS), Doc. No. 55 at 4 (D. Minn. Oct. 22, 2024) (Order Denying Motion to Remand). The precise relationship between Fifth Third and Dividend Solar Finance LLC is not relevant to this motion to dismiss.

or smartphone while at the consumer's home. They also collect consumers' signatures on the electronic devices. MCC ¶¶ 104–05, 109.

### *Platform or Dealer Fees*

Chief among the Plaintiffs' complaints is Dividend's alleged failure to disclose the full cost of its financing to consumers through the application of a so-called "dealer fee" or "platform fee." In practice, the platform fee "can exceed tens of thousands of dollars." MCC ¶¶ 8, 114. "The Dividend Defendants . . . execute agreements with each of their installment partners that establish these fees based on set percentages of the total price of the relevant solar system, typically between 10 and 30 percent of the solar system's actual value." MCC ¶ 126. While the platform fee is included in sales financed by a Dividend loan, no such fee is imposed when a consumer purchases the solar panel system with cash. MCC ¶ 127.

At the time of the sale, the platform fee is not included in the Dividend-generated quote provided by the installer's salesperson to the consumer. MCC ¶ 119. In fact, Dividend instructs the sellers/installers and their sales personnel not to disclose the platform fee and to resist telling the customer the "cash price" of the system to avoid revealing the existence of the fee. MCC ¶ 164. Instead, Dividend conceals the platform fee in its financing agreements by including the amount of the fee in the loan principal. MCC ¶¶ 8–9, 114, 132. The documents provided to the consumer essentially hide the platform within the apparent cost of equipment and installation, though in reality it is not part of those costs. MCC ¶¶ 114, 119, 132. Under this arrangement, Dividend does not remit the full amount reflected on the loan documents to the seller/installer; rather, Dividend deducts the amount of the platform fee from the loan funds that are actually given to the seller/installer, and keeps it. MCC ¶¶ 136, 138.

For example, plaintiff Heather Kenny purchased a solar panel system to be installed on her home and agreed to finance that transaction through Dividend. MCC ¶¶ 123, 155, 439–48. The actual loan principal for the purchase and installation was $44,360, but the loan documents reflected a principal amount of $70,661. The difference of $26,301 comprises the undisclosed platform fee. MCC ¶¶ 123, 155, 444. Although Ms. Kenny was told that her loan had a low APR of 3.99 percent, if the platform fee were excluded from the principal, the functional APR of the loan was greater than 7 percent. MCC ¶¶ 123, 155. In effect, Ms. Kenny alleges that the undisclosed platform fee operates as an immediate interest charge—in her case requiring an interest payment of more than 55 percent of the actual value of the loan. MCC ¶ 155; *see also* MCC ¶¶ 156–57 (discussing undisclosed platform fee for plaintiffs Torrado and Yarnall). Although the loan agreement stated that the loan proceeds would be used "'solely' for 'the design and installation for solar photovoltaic (PV) electricity generation, energy storage, and/or related equipment or improvements . . . at the home,'" and that the full amount of credit ($70,661) would be paid directly to the seller for the equipment and installation, Dividend did not disburse the full $70,661 to the seller/installer and instead kept $26,301. MCC ¶ 445–47. These allegations form the centerpiece of the plaintiffs' TILA claim. MCC ¶¶ 649–63.

### Sales Tactics

The plaintiffs allege that the salespeople offering the Dividend Defendants' loans use deception to induce homeowners into agreeing to purchase the solar panel systems and assenting to the loan terms. MCC ¶¶ 159–69. Dividend "dictates the terms and methods that the installer uses in their door-to-door marketing efforts, including providing training videos and presentations on their loan products and the best methods to use to sign up consumers for their loans." MCC

¶ 160. The installers' salespeople follow Dividend's instructions to conceal the undisclosed platform fee from consumers. MCC ¶ 159.

The sellers/installers allegedly use high-pressure door-to-door sales tactics, promising significant financial savings, performance results, and tax benefits. MCC ¶¶ 5, 105. Dividend's technology allows the salesperson to control the presentation of the terms of the loan agreements and to take signatures directly on their own tablets without giving the consumer a chance to review the terms of the agreement. MCC ¶¶ 109, 161–62. The sales representatives' presentations "focus almost exclusively on the alleged savings of financing a solar panel system versus paying for conventional electricity from a utility provider." MCC ¶ 110. The loans are presented "as a lower-cost alternative to conventional electricity," "designed to take advantage of solar tax incentives by requiring a lump-sum payment within the first few months of the loan (typically 18 months), followed by lower monthly payments across the 10-to-30-year life of the loan." MCC ¶ 111. "[T]he Dividend Defendants instruct and train their partners to emphasize the monthly installment payment instead of the total cost of the loan so that consumers believe they are obtaining far greater costs savings than is actually the case." MCC ¶ 165. Dividend's "partners purposefully use the financing offered by [Dividend] as the primary means of obtaining new customers by comparing what on paper appears to be a low monthly payment with the customers' monthly electricity bill." MCC ¶ 167. However, if a consumer is unable to "take advantage of solar tax credits or otherwise make this lump-sum payment . . ., the loans automatically re-amortize, resulting in a sharp increase in the monthly payment that often is far greater than the consumer's pre-solar electricity bill." MCC ¶ 112.

Plaintiffs further allege that "[a]s a result of the undisclosed platform fee . . ., the actual APR of the loans exceeded more than twice the usurious interest rates of the states in which each

Class Plaintiff and putative Class member resides and took out their respective loans." MCC ¶ 139. State usury laws in Florida, Arizona, South Carolina, Missouri, New Jersey, Connecticut, Georgia, Virginia, Massachusetts, Texas, North Carolina, Utah, and Tennessee cap interest rates on loans like those made by Dividend. MCC ¶¶ 140–52. The interest rate of each Class Plaintiff's and putative class member's loan exceeded more than twice the usury rate in each of these states. MCC ¶ 154.

### The Dividend RICO Enterprise

Dividend contracted with many seller/installers, including several entities that are named defendants in this MDL proceeding. Among the solar installers who acted on Dividend's behalf are: Wolf River Electric; Power Home Solar, LLC (d/b/a Pink Energy); All Energy Solar; Everlight Solar; Sun Badger Solar; Vision Solar; Atlantic Key Energy; EMPWR; Top Tier Solar; Lumio HX; Momentum Solar, LLC; Infenergy LLC; Glyde Solar, LLC; Sunergy Solar; Fluent Solar, LLC; Nebula Solar; and United Home Solutions Group. MCC ¶ 170. Plaintiffs allege that "Dividend contracted with each of these installers for the purpose of enticing homeowners to enter into solar energy loans that they knew included misrepresentations," and these installers functioned as members of a "Dividend Enterprise" that "conspired to disguise and issue high-interest, usurious loans based on intentionally deceptive sales practices." MCC ¶ 171–72.

In connection with their RICO claims, Plaintiffs assert that the "Dividend Enterprise engaged in countless predicate acts [of wire fraud] and attempts to collect unlawful debts through its predatory lending practices." MCC ¶ 213. Dividend provided loan disclosure statements to homeowners through online applications that "falsely represented the amount financed as being inclusive of the system and labor costs when, in reality, the Dividend Enterprise had baked in a hefty undisclosed finance charge," thereby "resulting in numerous violations of the federal wire

6

fraud laws." MCC ¶ 214–15 (citing 18 U.S.C. §§ 1341, 1343). And because the loans issued to the plaintiffs more than doubled the allowable interest rates under the relevant state usury laws, those loans constituted unlawful debts under 18 U.S.C. § 1961(6). MCC ¶ 216. These allegations are primarily relevant to the plaintiffs' civil RICO claim. MCC ¶¶ 664–91.

## DISCUSSION

### I.    Legal Standard

To survive a Rule 12(b)(6) motion to dismiss, a complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). This standard does not require the inclusion of "detailed factual allegations" in a pleading, but the complaint must contain facts with enough specificity "to raise a right to relief above the speculative level." *Id.* at 555. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements," are not sufficient. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 555). In applying this standard, the Court must assume the facts in the complaint to be true and take all reasonable inferences from those facts in the light most favorable to the plaintiff. *Morton v. Becker*, 793 F.2d 185, 187 (8th Cir. 1986); *see Waters v. Madson*, 921 F.3d 725, 734 (8th Cir. 2019). But the Court need not accept as true any wholly conclusory allegations or legal conclusions that the plaintiff draws from the facts pled. *Glick v. W. Power Sports, Inc.*, 944 F.3d 714, 717 (8th Cir. 2019).

## II.     TILA Claim

Plaintiffs bring Count One of the Master Complaint on their own behalf and on behalf of a putative class,[4] claiming that the platform fee is a "finance charge" under the Truth in Lending Act that the Dividend Defendants were statutorily required to disclose, but instead was concealed. The Dividend Defendants argue that Plaintiffs fail to state a TILA claim because the allegations show that the platform fee is not a finance charge. For the reasons that follow, the Court finds that Plaintiffs have stated a TILA claim.

In 1968, Congress enacted TILA as part of the Consumer Credit Protection Act. TILA's purpose is "to assure a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him and avoid the uninformed use of credit." 15 U.S.C. § 1601(a); *Chase Bank USA, N.A. v. McCoy*, 562 U.S. 195, 198 (2011) ("Congress passed TILA to promote consumers informed use of credit by requiring meaningful disclosure of credit terms.") (internal quotations omitted). Because it is a remedial statute, both TILA and its implementing regulations ("Regulation Z") are "to be construed broadly in favor of consumers." *Rand Corp. v. Yer Song Moua*, 559 F.3d 842, 845 (8th Cir. 2009).

TILA requires a creditor to make certain disclosures in consumer credit transactions. 15 U.S.C. § 1638(a). Among them, the creditor must disclose: (1) the "amount financed"; and (2) the

---

[4] The proposed "TILA Class" is defined in the Master Complaint as follows:

> All consumers who: (1) borrowed money from Fifth Third Bank or its predecessor Dividend Solar Finance LLC for the purchase of a solar panel system; (2) where the stated amount of the loan included a fee not paid to the seller/installer; and (3) where the amount disbursed to the seller/installer was less than the TILA cap under 15 U.S.C. § 1603(3), as adjusted annually.

MCC ¶ 628.

"finance charge," which must also be expressed as an "annual percentage rate." 15 U.S.C. § 1638(a)(2), (3), (4). The "amount financed" is "the amount of credit of which the consumer has actual use." 15 U.S.C. § 1638(a)(2). A "finance charge" is "the sum of all charges, payable directly or indirectly by [the consumer], and imposed directly or indirectly by [the lender] as an incident to the extension of credit." 15 U.S.C. § 1605(a). The finance charge "does not include charges of a type payable in a comparable cash transaction." *Id.*

## A. Finance Charge

Dividend argues that the Court should dismiss the TILA claim because, as a matter of law, the platform fee is not a "finance charge" within the meaning of the statute, and therefore, Dividend was not required to disclose its existence to any consumer. As explained below, and in full recognition of the procedural lens through which the Court is asked to consider this issue, the motion to dismiss the TILA claim is denied.

Dividend's motion requires the Court to interpret TILA and apply the meaning of the law to the facts alleged in the Master Complaint. As in all matters of statutory interpretation, the Court begins with the language of the statute, "giving words the meaning that proper grammar and usage would assign them." *Union Pac. RR Co. v. Surface Transp. Bd.*, 113 F.4th 823, 833 (8th Cir. 2024) (quoting *United States v. Lester*, 92 F.4th 740, 742 (8th Cir. 2024)). "[I]f the intent of Congress can be clearly discerned from the statute's language, the judicial inquiry must end." *Lester*, 92 F.4th at 742 (quoting *United States v. Jungers*, 702 F.3d 1066, 1069 (8th Cir. 2013)). "The plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole." *LaCurtis v. Express Med. Transp., Inc.*, 856 F.3d 571, 578 (8th Cir. 2017) (quoting *Robinson v.*

*Shell Oil Co.*, 519 U.S. 337, 341 (1997)). "A statutory provision is ambiguous if it is susceptible to more than one reasonable interpretation." *Id.* (cleaned up).

In TILA, Congress explicitly defined the "finance charge" as follows:

> [T]he amount of the finance charge in connection with any consumer credit transaction shall be determined as *the sum of all charges, payable directly or indirectly by the person to whom the credit is extended, and imposed directly or indirectly by the creditor as an incident to the extension of credit*. The finance charge does not include charges of a type payable in a comparable cash transaction. The finance charge shall not include fees and amounts imposed by third party closing agents (including settlement agents, attorneys, and escrow and title companies) if the creditor does not require the imposition of the charges or the services provided and does not retain the charges.

15 U.S.C. § 1605(a) (emphasis added). This language is parroted in the Consumer Financial Protection Bureau's ("CFPB") definition of finance charge that is found in Regulation Z. 12 C.F.R. § 1026.4(a) (stating that the finance charge is "the cost of consumer credit as a dollar amount" and "includes any charge payable directly or indirectly by the consumer and imposed directly or indirectly by the creditor as an incident to or a condition of the extension of credit. It does not include any charge of a type payable in a comparable cash transaction"). There is no dispute that if a charge fits this definition, TILA requires its disclosure.

Dividend does not suggest that TILA's definition of finance charge is unclear or that some term in that definition plainly forecloses Plaintiffs' claim. Indeed, Dividend does not really engage with the statutory text at all. However, a straightforward reading of the definition's text and the ordinary meaning of the words Congress used are clear. If a consumer is responsible for paying a charge and the creditor imposes that charge on the consumer incident to the extension of credit, then it is a finance charge. This is true whether the consumer's obligation to pay the charge or the creditor's imposition of it are *direct* or *indirect*.

As alleged in the Master Complaint, the platform fee appears to fit rather neatly into TILA's definition of "finance charge." The fee is one that is imposed by the Dividend Defendants. No one suggests that imposition is not incident to the extension of credit. The consumer has the responsibility to pay the platform fee. Under § 1605's definition, it makes no difference whether Dividend imposes the fee on the consumer "directly or indirectly." Nor does it matter whether the consumer has to pay the fee "directly or indirectly." Either way it is still a finance charge. Dividend points to no language in TILA's definition of finance charge or elsewhere in the statute that contradicts this application of the plain language to the platform fee.

Moreover, applying the plain statutory language in this way aligns with both TILA's purpose and the command that TILA be interpreted broadly in favor of consumers. At a minimum, the Court's interpretation helps the consumer avoid the uninformed use of credit. Requiring disclosure ensures that if the consumer finances the purchase of a solar panel system, she knows that Dividend is extending credit to her subject to a substantial charge that she would not have to pay if she made the purchase based on cash. *Cornist v. B.J.T. Auto Sales, Inc.*, 272 F.3d 322, 327 (6th Cir. 2001). ("These provisions require sellers to disclose as 'finance charges' fees payable by credit customers, but not by cash customers, in comparable transactions."); *Tennessee ex rel. Skrmetti v. Ideal Horizon Benefits*, No. 3:23-cv-46 (DCLC/JEM), 2024 WL 4351650, at *15 (E.D. Tenn. Sep. 30, 2024) (same, citing *Cornist*). And "[a]n increase in the base price of an automobile that is not charged to a cash customer, but is charged to a credit customer, *solely because he is a credit customer,* triggers TILA's disclosure requirements." *Cornist*, 272 F.3d at 327.

## B. Seller's Points

Nonetheless, the Dividend Defendants argue that in Regulation Z, so-called "seller's points" are excluded from the definition of "finance charge," and as pled in the Master Complaint,

the platform fees in Plaintiffs' transactions are seller's points. Through Regulation Z, the Consumer Financial Protection Bureau ("CFPB") has developed the understanding of what is, and what is not, a "finance charge" that must be disclosed pursuant to TILA.[5] 12 C.F.R. § 1026.4(a) (defining finance charge as any "charge payable directly or indirectly by the consumer and imposed directly or indirectly by the creditor as an incident to or a condition of the extension of credit"). In addition to parroting the language found in TILA's own definition, 15 U.S.C. § 1605(a), the finance charge regulation provides that eight categories of charges "are not finance charges." 12 C.F.R. § 1026.4(c). Among that list is the category of "Seller's points," 12 C.F.R. § 1026.4(c)(5), but the regulation says nothing about what kinds of charges fit within or fall outside this category of seller's points. Instead, the CFPB issued the following interpretive guidance on that point:

> The seller's points mentioned in § 1026.4(c)(5) include any charges imposed by the creditor upon the noncreditor seller of the property for providing credit to the buyer or for providing credit on certain terms. These charges are excluded from the finance charge even if they are passed on to the buyer, for example, in the form of a higher sales price. Seller's points are frequently involved in real estate transactions guaranteed or insured by governmental agencies. A commitment fee paid by a noncreditor seller (such as a real estate developer) to the creditor should be treated as seller's points. Buyer's points (that is, points charged to the buyer by the creditor), however, are finance charges.

12 C.F.R. Pt 1026, Supp. I, Para. 4(c)(5)-1 ("Commentary"). The platform fees are seller's points, Dividend says, because the Master Complaint alleges that the creditor (Dividend) imposes the fee on the noncreditor seller (the installers) for providing credit to the buyer (Plaintiffs), and the platform fees are passed on to the buyer in the form of a higher sales price.

---

[5] Congress delegated to the CFPB the authority to promulgate rules implementing TILA. 15 U.S.C. § 1604(a).

For several reasons, the Court disagrees that Plaintiffs' TILA claim must be dismissed on this basis. First, the CFPB's Commentary regarding seller's points indicates that they are frequently used in real estate transactions, and in that context, the parties agree that seller's points are uniformly *not concealed* as part of an increased base price. Rather, in real estate transactions (such as a consumer's purchase of a residential home) seller's points are negotiated and explicitly agreed upon by the buyer and the seller. Here, Plaintiffs allege that Dividend essentially dictates to the installers that it will hold back the platform fee from disbursed funds for any transaction where a consumer agrees to finance the purchase of the solar panel system, and it instructs the installer not to disclose the platform fee to the buyer. When the Commentary references real estate transactions in which seller's points are uniformly disclosed to consumers, it is difficult to see how seller's points applies to a charge that is intentionally concealed in the manner Plaintiffs allege here.[6]

Moreover, although Dividend is correct that the Commentary does not expressly limit the use of seller's points to real estate transactions, it is noteworthy that real estate deals are the only type of transaction referenced in the Commentary. Neither party has identified a single example of how seller's points operate in practice in any non-real estate transaction. And at the hearing on the motion to dismiss, counsel for the Dividend Defendants could not point to any instance

---

[6] In the typical example of seller's points in the purchase of a residential home, the seller will agree to pay a portion of the buyer's closing costs in exchange for a corresponding increase to the agreed upon sales price of the home. In this way, the buyer will pay less than she would otherwise have had to—even though the full amount of the loan she receives is higher, she benefits because she can still complete the purchase when she may not have had the assets to make the full up front payment without the seller's commitment. Meanwhile, the seller still receives the amount originally agreed upon for the sale of the home. Every aspect of that transaction is right out in the open, and that seems as likely an explanation for why the CFPB's Commentary indicates that TILA's disclosure obligations are unnecessary even when the charges are passed on in the form of a higher sales price.

anywhere employing the term "seller's points" outside the real estate context. The Court's own research, too, has failed to identify such an example. This makes it more difficult for the Court to countenance Dividend's suggestion that applying the regulatory carve out for seller's points in this non-real estate context would serve TILA's purpose of ensuring that consumers "avoid the uninformed use of credit." 15 U.S.C. § 1601(a).

Second, accepting Dividend's position that the platform fees are seller's points excluded from the finance charge creates an untenable tension between the CFPB's interpretive Commentary and the plain language of the statutory definition. Doing so would mean that a charge "payable directly or indirectly by the person to whom the credit is extended, and imposed directly or indirectly by the creditor as an incident to the extension of credit," 15 U.S.C § 1605(a), would not, in fact, be a finance charge.

Third, Dividend has failed to point the Court to any caselaw that applies the Commentary regarding seller's points in this manner. And what little case law does exist in this area does not help the Dividend Defendants. It appears that only one other court has addressed the applicability of the seller's-points exception—*Ideal Horizon*, 2024 WL 4351650—and it did so in the context of motion to dismiss a complaint with allegations similar to those brought by the Plaintiffs in this case. The *Ideal Horizon* court rejected the solar lender's argument that its own dealer fees were, as a matter of law, seller's points and denied the creditor's motion to dismiss. *Id.* at *15. The court reasoned that whether the lender's fees were finance charges depended on whether cash customers were charged the same amount as credit customers for purchasing the solar panel systems, and that question involved disputed facts that would not allow the issue to be resolved on a Rule 12(b)(6) motion. *Id.* Similarly, in *Cornist* the court's focus in determining whether the defendant violated TILA by failing to disclose the finance charge was on the price differential for credit customers

and cash customers, indicating that evidence of a systematic and significant difference in price would be probative of the existence of an undisclosed finance charge. 272 F.3d at 328–29.

For these reasons, the Court cannot conclude that Plaintiffs' TILA claims fail as a matter of law.

## C.  Statute of Limitations

Next, Fifth Third moves to dismiss some of Plaintiffs' TILA claims because they did not file their lawsuits until more than one year after they agreed to finance the purchase of solar panel systems for their homes. Except in circumstances not applicable here, TILA imposes a one-year statute of limitations. 15 U.S.C. § 1640(e) (requiring any action alleging that a creditor has violated the statute to "be brought in any United States district court, or in any other court of competent jurisdiction, within one year from the date of the occurrence of the violation").

A defendant's claim that an action is barred by a statute of limitations is "an affirmative defense that the defendant must plead and prove." *Jessie v. Potter*, 516 F.3d 709, 713 n.2 (8th Cir. 2008). "[T]he possible existence of a statute of limitations defense is not ordinarily a ground for Rule 12(b)(6) dismissal unless the complaint itself establishes the defense." *Id.* (citing *Varner v. Peterson Farms*, 371 F.3d 1011, 1017–18 (8th Cir. 2004)). To dismiss a complaint on statute-of-limitations grounds, the face of the pleading must "clearly indicate that the claims are untimely." *Doe v. Anoka Cnty.*, No. 21-cv-2649 (ECT/TNL), 2025 WL 756449, at *7 (D. Minn. Mar. 10, 2025) (cleaned up), *appeal filed,* No. 25-1568 (8th Cir. Mar. 21, 2025).

When a claim in a complaint appears to be untimely, a plaintiff may avoid dismissal if there is a basis to apply rules that toll the statute of limitations. *Id.* Courts have found that a plaintiff may toll the statute of limitations on a TILA claim with a showing that a defendant engaged in concealment or fraud. *McAnaney v. Astoria Fin. Corp.*, 357 F. Supp. 2d 578, 587 (E.D.N.Y. 2005);

15

*Evans v. Rudy-Luther Toyota, Inc.*, 39 F. Supp. 2d 1177, 1182 (D. Minn. 1999) (finding on summary judgment that plaintiff failed to demonstrate circumstances that would justify application of equitable tolling); *see also Jones v. TransOhio Savings Ass'n*, 747 F.2d 1037, 1043 (6th Cir. 1984) (holding that equitable tolling applied to TILA claim and reversing dismissal where the complaint alleged fraudulent concealment). However, courts do not uniformly require plaintiffs to include detailed factual allegations in a complaint to defeat an affirmative defense that a claim is time-barred. *Compare Metro. St. Louis Equal Hous. Opportunity Council v. Tillman*, No. 7-04114-CV-C-NKL, 2007 WL 3046585, at *2 (W.D. Mo. Oct. 16, 2007) ("[Plaintiff] was under no obligation to plead enough facts to defeat Johnson's statute of limitations defense."), *with Doe*, 2025 WL 756449, at *8–9 (analyzing the sufficiency of the complaint's allegations to establish equitable tolling of the limitations period on a motion to dismiss).

Here, even assuming that Plaintiffs have an obligation to set forth with particularity the facts that form the basis of their claims of fraudulent concealment, the Court finds that they have done so. The Master Complaint alleges that Dividend specifically prevented installers from informing customers about the cash value of the solar panel systems they are marketing in their door-to-door sales. Dividend has also allegedly instructed installers to say nothing about the existence of the platform fee during discussions with consumers. And Dividend provided documents that allegedly misrepresent that the full amount of the loan proceeds will be used solely

for covering the costs of the solar panels, associated equipment, and labor.[7] The Court acknowledges that the Master Complaint does not spell out chapter and verse the precise details of the alleged interactions between Dividend and the installers, facts the Plaintiffs here could not be expected to have available to them at this stage. Under these circumstances, the Court finds the allegations are sufficiently particular to give Dividend the notice required under Rule 9(b). *See BJC Health Sys. v. Columbia Cas. Co.*, 478 F.3d 908, 917 (8th Cir. 2007) (indicating that the level of particularity required under Rule 9(b) varies depending on the circumstances, including "the nature of the case and the relationship between the parties"). Whether Plaintiffs will ultimately be able to support these allegations with evidence sufficient for a finding of equitable tolling in their favor is not for the Court to decide today.

### D. Statutory Maximum

Finally, Dividend argues that several of Plaintiffs' claims should be dismissed because they involve loans that exceed the statutory maximum to which TILA applies, exempting them from TILA's disclosure requirements. As an example, they point to Plaintiff Kenny's June 1, 2023 loan for $70,661, at a time when the TILA statutory maximum was $66,400. Defs.' Mem. 19–20.

Under TILA's "exempted transactions" provision, the law's requirements do not apply to "[c]redit transactions . . . in which the total amount financed exceeds $50,000." 15 U.S.C.

---

[7] The Dividend Defendants argue that these allegations fail as a matter of law to support tolling of the limitations period because they are not acts of concealment that are separate from the alleged failure to disclose forming the underlying TILA violation. Defs.' Mem. 17–18. In support of this argument, they cite *Logan v. McCarthy's Oldsmobile-GMC Trucks, Inc.*, No. 97-cv-1834 (DSD/JMM), 1998 WL 34072617, at *4 (D. Minn. May 5, 1998). Aside from the fact that it was decided on a complete record at summary judgment, *Logan* is distinguishable because it involved the plaintiffs' failure to point to any evidence of an "act in addition to the commission of the initial" failure to disclose. *Id.* (citing *Gibson v. Bob Watson Chevrolet-Geo, Inc.*, 112 F.3d 283, 286 (7th Cir. 1997)). Here, the allegations in the Master Complaint go beyond simply failing to include the platform fee in the TILA disclosures, and include both separate acts of concealment and misrepresentations.

§ 1603(3); *Koons Buick Pontiac GMC, Inc. v. Nigh*, 543 U.S. 50, 62 n.10 (2004) ("TILA does not

in general apply to credit transaction in which the total amount financed exceeds $25,000.").[8]

Under Regulation Z, the "threshold amount . . . is adjusted annually to reflect increases in the

Consumer Price Index for Urban Wage Earners and Clerical Workers. . . ." 12 C.F.R.

§ 1026.3(b)(1)(ii). According to the Commentary, the current threshold amount is $71,900. 12

C.F.R. Pt 1026, Supp. I, Para. 3(b)3(xvi).[9]

The precise method for determining whether "the total amount financed," 15 U.S.C.

§ 1603(3), exceeds the statutory threshold involves deductions for any amounts "wrongfully

included" because finance charges are not included in the computation of the "amount financed."

*Leal v. Sonic-Massey Pontiac Buick GMC, Inc.*, 444 F. Supp. 2d 1163, 1164–65 (D. Colo. 2006)

(citing 15 U.S.C. § 1638(a)(2)(A)[10]). Although TILA plainly imposes a threshold amount for

---

[8] Section 1603 was amended in 2011 to increase the statutory maximum in paragraph (3) from $25,000 to $50,000 to adjust for inflation. Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. 111-203, Title X, § 100E(a)(1). Congress also required the CFPB to "adjust annually the dollar amounts in [§ 1603(3)] of the Truth in Lending Act . . ., by the annual percentage increase in the Consumer Price Index for Urban Wage Earners and Clerical Workers, as published by the Bureau of Labor Statistics. . . ." *Id.*, § 100E(b).

[9] At the time of Ms. Kenny's June 1, 2023 transaction, the threshold amount was $66,400. 12 C.F.R. Pt. 1026, Supp. I, Para. 3(b)(3)(xiv).

[10] Under 15 U.S.C. § 1638(a)(2)(A), the "amount financed" is the "amount of credit of which the consumer has actual use" and is computed by:

> (i) tak[ing] the principal amount of the loan or the case price less downpayment and trade-in;
>
> (ii) add[ing] any charges which are not part of the finance charge or of the principal amount of the loan and which are financed by the consumer, including the cost of any items excluded from the finance charge pursuant to section 1605 of [Title 15]; and
>
> (iii) subtract[ing] any charges which are part of the finance charge but which will be paid by the consumer before or at the time of the consummation of the transaction, or have been withheld from the proceeds of the credit.

15 U.S.C. § 1638(a)(2)(A)(i)–(iii).

consumer credit transactions above which its provisions are inapplicable, the Court declines to dismiss any of the Plaintiffs' claims due to the TILA "cap." The question whether any amounts should be deducted from "the total amount financed" when considering the threshold amount is a fact issue that cannot be resolved on the incomplete record before the Court. *See id.* at 1165 (concluding that "the amount financed for the [plaintiffs'] purchase of [a vehicle] falls within the scope of TILA" once certain charges are deducted from the required calculation). And allowing Dividend to use a substantial concealed finance charge to inflate the "amount financed" beyond TILA's protections would clearly undermine the statute's protections.

For these reasons, the motion to dismiss Plaintiffs' TILA claim is denied.

## III.    Fraud Claim

Dividend next moves to dismiss the fraud claim in Count XVII of the Master Complaint. The Court is not persuaded that the fraud claims is deficient.

There is no dispute that Plaintiffs' fraud claim must comply with Federal Rule of Civil Procedure 9(b). Under that Rule, Plaintiffs are required to "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). This means Plaintiffs must allege "such matters as the time, place, and contents of false representations, as well as the identity of the person making the misrepresentation and what was obtained or given up thereby." *Drobnak v. Andersen Corp.*, 561 F.3d 778, 783 (8th Cir. 2009) (quoting *Schaller Tel. Co. v. Golden Sky Sys., Inc.*, 298 F.3d 736, 746 (8th Cir. 2002)).

First, Dividend criticizes Plaintiffs for failing to allege that a single state's law applies and not addressing in the Master Complaint how fraud claims differ from state to state. But the parties have generally agreed that, for purposes of this motion, the relevant elements of a common-law fraud claim are similar from state to state. *Compare* Defs.' Mem. 20 (listing elements of a fraud

claim under Florida law), *with* Pls.' Mem. 26 n.6 (suggesting that "the elements are largely identical in every state" and that the court need not engage in a choice-of-law analysis at this stage). For example, "[u]nder Florida law, the essential elements of common law fraud are: '(1) a false statement concerning a material fact; (2) the representor's knowledge that the representation is false; (3) an intention that the representation induce another to act on it; and (4) consequent injury by the party acting in reliance on the representation.'" *State Farm Mut. Auto. Ins. Co. v. Performance Orthopaedics & Neurosurgery, LLC*, 278 F. Supp. 3d 1307, 1317 (S.D. Fla. 2017) (quoting *Butler v. Ysem*, 44 So.3d 102, 105 (Fla. 2010)). Though the precise division of individual elements and verbiage varies, the common law of fraud in other potentially relevant states has similar elements.[11] *See, e.g.*, *Arvizu v. Medtronic Inc.*, 41 F. Supp. 3d 783, 791 (D. Ariz. 2014) (Arizona law); *Taylor v. Am. Chem. Council*, 576 F.3d 16, 31 (1st Cir. 2009) (Massachusetts law); *In re Colonial Ltd. P'Ship Litig.*, 854 F. Supp. 64, 101 (D. Conn. 1994) (Connecticut law). Given that Dividend raised broad challenges to the viability of the fraud claim, the absence of any assertion that a choice-of-law analysis must be undertaken now, and the lack of briefing on the issue, the Court finds it unwise to set off on an unchaperoned frolic through the potential differences in the common law of fraud from state to state.

Second, Dividend asserts that Plaintiffs have premised their fraud claim on Dividend's failure to make a required disclosure under TILA, which Dividend denies. Defs.' Mem. 21–23. The Court disagrees for the reasons set out above.

---

[11] Fourteen of the Class Representative Plaintiffs are Florida citizens. MCC ¶¶ 18, 22, 24, 40–48. There are other Class Representative Plaintiffs from Arizona, Massachusetts, Connecticut, Texas, South Carolina, Missouri, Utah, New Jersey, Georgia, Virginia, North Carolina, and Tennessee. MCC ¶¶ 18–50. Individual Plaintiffs are citizens of these same states and Michigan. MCC ¶¶ 52–80.

Third, Dividend contends that Plaintiffs' fraud claim cannot be based on an alleged omission because the Master Complaint does not plead facts showing Dividend had a duty to disclose the Platform Fee, such as the existence of a special relationship. Defs.' Mem. 24. But Plaintiffs assert that the fraud claim is premised "not . . . on omissions but affirmative misrepresentations." Pls.' Mem. 29. The Court agrees. Plaintiffs have alleged a rather straightforward theory that the Dividend Defendants made affirmative misrepresentations in the loan documents themselves, and those misrepresentations induced Plaintiffs to agree to the loans.[12]

Specifically, Plaintiffs allege that each loan agreement falsely states that the principal amount represented in the agreement is the sum of all payments the lender is making on the borrower's behalf. However, at the time of each transaction, the Master Complaint asserts that Dividend knew that the loan's purported principal balance included a hidden Platform Fee. In addition, Plaintiffs allege that the documents state that the proceeds of the loan will solely be used for the design and installation of solar electricity generation, energy storage, and related equipment and improvements, though the Dividend Defendants knew that the represented proceeds would not be going solely toward these items, but also toward the sizeable Platform Fee. The Court finds these allegations are sufficient to satisfy the particularity requirements of Rule 9(b) and are consistent with the purposes of that Rule. *See Drobnak*, 561 F.3d at 783 (explaining that the particularity requirement "is intended to enable the defendant to respond specifically and quickly to the potentially damaging allegations") (quoting *United States ex rel. Johsi v. St. Luke's Hosp., Inc.*, 441 F.3d 552, 556 (8th Cir. 2006)).

---

[12] Relatedly, Dividend argues that the fraud claim should be dismissed because Plaintiffs cannot plead a viable fraud claim based solely upon an alleged breach of contract. However, the Court finds that Plaintiffs' fraud claims do not attempt to transform a simple breach of contract into a fraud claim; rather, they have alleged fraud in the inducement.

Finally, Dividend asserts that Plaintiffs fail to plead fraudulent intent because they have not identified which corporate officer made any representation with knowledge that it was false. Defs.' Mem. 25–26. The Court finds dismissal on this ground is not required for at least two reasons. First, to the extent Dividend suggests that Plaintiffs were required to allege intent with particularity, that is contrary to Rule 9(b), which allows a plaintiff asserting a fraud claim to allege knowledge and intent generally. Fed. R. Civ. P. 9(b) ("Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."). Second, Dividend cites no controlling case applying the requirement that a plaintiff identify the corporate officer responsible for making the alleged misrepresentation under comparable circumstances.[13] And here, because Plaintiffs assert that the affirmative misrepresentations inducing them to take on solar-panel-system loans appeared in the loan documents themselves, the information about which corporate officer or officers were responsible for the content of the documentation is peculiarly within the knowledge or control of the Dividend Defendants. *See* 2 Moore's Federal Practice – Civil, *Pleading Fraud, Mistake, and Conditions of the Mind*, § 9.03[1][b] & n.21 (2025) (indicating that courts provide some "leeway in pleading when the necessary information is under the exclusive control of the defendant" and citing cases).

---

[13] Dividend cites the discussion of pleading requirements for a claim based on collective corporate scienter in *Milavetz, Gallop & Milavetz, P.A. v. Wells Fargo Bank, N.A.*, No. 12-cv-875 (MGD/JJG), 2012 WL 4058065, at *3-4 (D. Minn. Aug. 22, 2012), *R&R adopted by,* 2012 WL 4056715 (D. Minn. Sep. 14, 2012). Here, given the circumstances of this case, the Court finds that the lack of allegations in the Master Complaint concerning a specific corporate officer with the requisite state of mind is not fatal to the fraud claim. *Cf.* Moore's Fed. Prac. § 9.03[1][g] ("For example, in a case of corporate fraud, if it is unreasonable to expect the pleader to have personal knowledge of the details of internal corporate affairs or to have access to such information, stringent pleading requirements will not be enforced and allegations based on information and belief may be allowed.").

## IV.    RICO Claim

Under the Racketeer Influenced and Corrupt Organizations Act, "[i]t shall be unlawful for any person employed by or associated with any enterprise engaged in … interstate … commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." 18 U.S.C. § 1962(c). The RICO statute allows individuals injured by a violation of section 1962 to file suit and recover treble damages and attorney's fees. 18 U.S.C. § 1964(c). Plaintiffs asserting civil RICO claims must satisfy the particularity requirements of Federal Rule of Civil Procedure 9(b) when they allege a pattern of racketeering activity involving fraud. *Target Corp. v. LCH Pavement Consultants, LLC*, No. 12-cv-1912 (JNE/JJK), 2013 WL 2470148, at *2 n.1 (D. Minn. June 7, 2013).

A civil RICO claim requires a plaintiff to allege that the defendant "engaged in (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *H&Q Props., Inc. v. Doll*, 793 F.3d 852, 856 (8th Cir. 2015) (cleaned up). To state a claim for relief, a plaintiff must allege each of the RICO elements. *Crest Const. II, Inc. v. Doe*, 660 F.3d 346, 355 (8th Cir. 2011) (citing *Gamboa v. Velez*, 457 F.3d 703, 705 (7th Cir. 2006)).

### A.  RICO Enterprise

The Dividend Defendants challenge the sufficiency of the RICO allegations on several grounds. As explained below, the Court finds that Plaintiffs have failed to allege the existence of a RICO enterprise.

"A RICO enterprise 'includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity.'" *Crest Const. II, Inc.*, 660 F.3d at 354 (quoting 18 U.S.C. § 1961(4)). To assert the existence of an association-in-fact enterprise, the Supreme Court requires three criteria to be satisfied: "a purpose,

relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose. *Boyle v. United States*, 556 U.S. 938, 946 (2009); *see also Nelson v. Nelson*, 833 F.3d 965, 968 (8th Cir. 2016) (discussing requirements for an association-in-fact enterprise and citing *Boyle*, 556 U.S. at 948). These criteria do not require the existence of a formal organization or any hierarchical structure. *Boyle*, 556 U.S. at 948. Indeed, to show the existence of an enterprise, a plaintiff does not need to allege "additional structural elements . . . beyond the enterprise being a 'continuing unit that functions with a common purpose.'" *Target Corp.*, 2013 WL 2470148, at *3 (quoting *Boyle*, 556 U.S. at 948).

Boyle clearly recognizes that "the universe of enterprises covered by [RICO] is 'obviously broad.'" *Sheet Metal Workers Local No. 20 Welfare and Benefit Fund v. CVS*, 305 F. Supp. 3d 337, 346 (D.R.I. 2018) (quoting *Boyle*, 556 U.S. at 944). And because the RICO statute serves a remedial purpose, courts construe it liberally. *Boyle*, 556 U.S. at 944. But even accounting for that liberal construction and broad scope, the universe of enterprises covered by RICO is not boundless. As *Boyle* plainly states, there must still be "relationships among those associated with the enterprise." 556 U.S. at 945;[14] *Target Corp.*, 2013 WL 2470148, at *4 ("[A]n association-in-fact enterprise requires more than parallel conduct; it requires relationships among those associated with the enterprise, and it requires those associated with the enterprise to function as a unit, that they be put together to form a whole.") (citing cases) (cleaned up).

---

[14] In explaining the requirement that an enterprise have a structure distinct from the pattern of racketeering activity, the *Boyle* Court also emphasized that the independent and uncoordinated acts of individuals would not support a determination that they were part of a RICO enterprise. 556 U.S. at 947 n.4 ("It is easy to envision situations in which proof that individuals engaged in a pattern of racketeering activity would not establish the existence of an enterprise. For example, suppose that several individuals, *independently and without coordination*, engaged in a pattern of crimes listed as RICO predicates—for example, bribery or extortion. Proof of these patterns would not be enough to show that the individuals were members of an enterprise.") (emphasis added).

The parties dispute whether Plaintiffs have alleged relationships among those associated with the enterprise. As noted, Plaintiffs assert that the members of the single Dividend Enterprise include the Dividend Defendants as well as several solar installers, including Wolf River Electric; Power Home Solar, LLC; All Energy Solar; Everlight Solar; Sun Badger Solar; Vision Solar; Atlantic Key Energy; EMPWR; Top Tier Solar; Lumio HX; Momentum Solar, LLC; Infenergy, LLC; Glyde Solar, LLC; Sunergy Solar; Fluent Solar, LLC; Nebula Solar; United Home Solutions Group; "and many others." MCC ¶ 170. The Master Complaint asserts that "Dividend contracted with each of these installers for the purpose of enticing homeowners to enter into solar energy loans that they knew included misrepresentations," and the installers functioned as members of a "Dividend Enterprise" that "conspired to disguise and issue high-interest, usurious loans based on intentionally deceptive sales practices." MCC ¶ 171–72. Moreover, Plaintiffs allege that Dividend dictates to the installers what sales tactics to use in their door-to-door marketing campaigns, instructs the installers to conceal the platform fee from consumers, and tells the installers to resist disclosing the cash price of the solar panel systems to the consumers. MCC ¶¶ 159–65.

Dividend argues that the civil RICO claim should be dismissed because Plaintiffs allege only a "rimless hub-and-spoke" arrangement between Dividend and its long list of solar partners. Dividend acknowledges that the Master Complaint asserts the existence of a relationship between it and each installer, but it argues there are no allegations demonstrating a relationship among the various installers. So, while Dividend is alleged to be the "hub" of the enterprise, and while it has a connection to each installer "spoke," there is no "rim" tying the various "spokes" together. Based on a careful review of the Master Complaint and the relevant caselaw, the Court agrees that Plaintiffs' complaint falls short in this way and that dismissal of the RICO claim is required.

While the Eighth Circuit has not explicitly held that a "rimless hub-and-spoke" arrangement cannot constitute an "enterprise" for purposes of a civil RICO claim, several other courts have reached that conclusion. *E.g.*, *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 374 (3d Cir. 2010) (finding that absent allegations that the insurer-partner spokes of an alleged enterprise had some "horizontal agreement" between them, the complaint did not "plausibly imply concerted action—as opposed to merely parallel conduct—by the insurers, and therefore cannot provide a 'rim' enclosing the 'spokes' of these alleged 'hub-and-spoke' enterprises"); *D'Addario v. D'Addario*, 901 F.3d 80, 100–01 (2d Cir. 2018) (same); *In re HomeAdvisor, Inc. Litig.*, 491 F. Supp. 3d 879, 890–91 (D. Colo. 2020) (same); *Moss v. BMO Harris Bank, N.A.*, 258 F. Supp. 3d 289, 302–03 (E.D.N.Y. 2017) (same); *Target Corp.*, 2013 WL 2470148, at *4 (same); *cf. Ill. Farmers Ins. Co. v. Mobile Diagnostic Imaging, Inc.*, No. 13-cv-2820 (PJS/TNL), 2014 WL 4104789, at *14 (D. Minn. Aug. 19, 2014) (noting that if the plaintiffs had alleged that all of the defendants "were involved in a single association-in-fact enterprise . . . that enterprise would have taken the form of a rimless hub-and-spokes organization"). As the Third Circuit explained, "[w]ere the rule otherwise, competitors who independently engaged in similar types of transactions with the same firm could be considered associates in a common enterprise[, which] would contravene *Boyle*'s definition of 'enterprise.'" *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d at 375. The Court finds the reasoning in these cases persuasive, and it predicts that the Eighth Circuit, if presented

with this issue, would apply that reasoning to the facts of this case.[15] Therefore, to the extent Plaintiffs argue a rimless hub-and-spoke enterprise suffices because no such relationships or coordination among the members of the alleged enterprise is required, the Court disagrees.

Even when viewed in the light most favorable to Plaintiffs, the complaint does not suffice to establish the existence of the singular enterprise Plaintiffs posit. Plaintiffs' alleged enterprise consists of Dividend at the "hub" and a long list of "spokes" comprised of the named installer partners, as well as other installers who are not specifically identified, with which Dividend contracted to market its loan products to consumers. But the complaint does not allege that there were any relationships between the various installers or other coordination among them. Instead, it alleges that each installer, "independently and without coordination," engaged in predicate RICO acts alongside Dividend. *D'Addario*, 901 F.3d at 101 (quoting *Boyle*, 556 U.S. at 947 n.4); *In re Insurance Brokerage*, 618 F.3d at 374 (explaining that allegations of parallel conduct are insufficient); *Target Corp.*, 2013 WL 2470148, at *4 (same). Without some allegation of relationships or coordination among the installers, the RICO claim fails.

Nevertheless, Plaintiffs argue that that their complaint supports an inference of coordinated conduct among the various installers because they are ostensibly competitors in the solar-panel-

---

[15] In cases decided after *Boyle*, the Eight Circuit has not specifically addressed whether a rimless hub-and-spoke arrangement of defendants meets the "enterprise" element of the RICO statute. But some cases have discussed the requirement that members of the alleged enterprise have relationships with one another. *See United States v. Quinn*, 131 F.4th 846, 857 (8th Cir. 2025) (finding that the relationships among members of a gang satisfied the enterprise element); *United States v. McArthur*, 850 F.3d 925, 934 (8th Cir. 2017) (discussing relationships among members of a gang as sufficient to establish the enterprise element of a RICO count); *Nelson v. Nelson*, 833 F.3d 965, 969 (8th Cir. 2016) (affirming dismissal of civil RICO claim where, among other reasons, there was "no indication" that an accountant and banker who purportedly formed part of the enterprise with the plaintiff's brother "had anything to do with each other or [the brother's] other partnerships and businesses").

system-installation market, and each agreed to offer loans to consumers that included the platform fee, thereby driving up the costs of the loans to consumers and preventing each individual installer from being able to compete with the others on price. In support of this argument Plaintiffs cite several cases, but the Court finds none supports Plaintiffs' position. For example, Plaintiffs argue that under the Third Circuit's *In re Insurance Brokerage* decision and *Sheet Metal Workers Local No. 20 v. CVS Pharmacy*, 305 F. Supp. 3d 337 (D.R.I. 2018), allegations that members of the enterprise acted against their own self-interest supports the existence of the "rim" tying the "spokes" together. But these cases are distinguishable.

In *In re Insurance Brokerage*, the plaintiffs alleged the existence of six RICO enterprises. 618 F.3d at 314. One of those enterprises, "the Marsh-centered enterprise," centered around Marsh & McLennan, an insurance broker, which solicited rigged or "false" bids for insurance contracts from insurers "that were intentionally higher than the bids of the insurer to which the broker wished to award the business." *Id.* at 312. Although the court found that the plaintiffs failed to adequately allege the existence of coordination among the spokes to support the other enterprises, it found "the allegations of bid rigging provide the 'rim' to the Marsh-centered enterprise's hub-and-spoke configuration, satisfying *Boyle*'s requirements." *Id.* at 375. The court found the complaint "plausibly evince[d] an expectation of reciprocity and cooperation among the insurers" where it alleged "the reasons why the insurers agreed to provide sham bids." *Id.* at 375–76. Specifically, one insurer's former employee stated that "his employer had agreed to provide losing quotes to Marsh in exchange for, among other things, Marsh's getting quotes from other insurance carriers that would support the employer . . . as being the best price." *Id.* (cleaned up). This quid pro quo was enough to establish coordination.

Essentially, the *In re Insurance Brokerage* court found that the nature of the bid-rigging scheme at the heart of the alleged Marsh-centered enterprise required the coordinated action and the tacit agreement of the insurers submitting the sham bids. Plaintiffs do not point to comparable allegations about Dividend and its installer partners that plausibly indicate those installers engaged in any coordinated conduct. Instead, as alleged, each installer agreed independently to work with Dividend and follow Dividend's instructions to conceal the platform fee because the installers all knew that they would be able to obtain more business if they made financing options, even options that used deception to make them appear more favorable, available to the homeowners they solicited. That is an example of parallel conduct that does not imply relationships among the members of the alleged enterprise.[16] Drawing the inference of coordination Plaintiffs request here is particularly unreasonable given that many of the installers operate in areas that are geographically remote from the others.

The *Sheet Metal Workers* court similarly found "that the allegations in the [complaint] assert[ed] rim enough around the spokes" to support a civil RICO claim.[17] *See* 305 F. Supp. 3d at 348. The plaintiffs in *Sheet Metal Workers* were health plans that claimed CVS Pharmacy engaged

---

[16] Other cases cited by Plaintiffs are distinguishable for similar reasons—courts found the plaintiffs alleged relationships among the members of the enterprise, not merely parallel conduct. *See Kia Am., Inc. v. DMO Auto Acquisitions, LLC*, 775 F. Supp. 3d 607, 624 (D.N.H. 2025) (finding allegations sufficient for enterprise element where members of the enterprise, including several dealerships within an "Auto Group" were subject to centralized control by their joint owner and chief operating officer, sold vehicles between the dealerships to receive incentive payments, and transferred inventory to prevent the manufacturer from learning that vehicles that were previously represented as sold to consumers were still available); *Fuji Photo Film U.S.A., Inc. v. McNulty*, No. 05 Civ. 7869 (SAS), 2009 WL 3334867, at *3 (S.D.N.Y. Oct. 14, 2009) ("The alleged enterprise was by no means 'rimless;' much of its success over a nine-year period was attributable to the *extensive cooperation among the vendor defendants*.") (emphasis added).

[17] Although *Sheet Metal Workers* involved a motion to amend the pleadings, the case involved a futility challenge to the proposed amendment, requiring the court to consider the plausibility of the allegations in the complaint according to Fed. R. Civ. P. 12(b)(6). 305 F. Supp. 3d at 343 (discussing interplay between futility challenge and Rule 12(b)(6)).

in fraud to prevent them from obtaining the best price available on generic drugs. The asserted RICO enterprise consisted of CVS and several Pharmacy Benefit Managers (PBMs) who allegedly conspired to hide the fact that CVS offered a discounted price only to individual cash-paying customers who had paid an annual membership fee while charging health plans a higher cost. *See id.* at 340–42 (describing the alleged scheme). Ultimately, the *Sheet Metal Workers* court explained that even though the plaintiffs did not allege "an explicit agreement among the PBMs to look the other way as CVS failed to report [the lower] prices," they did "allege the PMBs [sic] communicated with each other and with CVS in order to orchestrate the alleged fraud." *Id.* at 349. The court further reasoned that the health plans' allegations that the PBMs acted against "their individual interests" and "in a manner that increased profit to both the PBMs and CVS at the expense of the plans, lends further credence to Plaintiffs [sic] allegation that they acted together." *Id.* at 349. There are no similar allegations in this case.[18]

Accordingly, Plaintiffs' RICO claim is dismissed. In addition, because the Court finds that Plaintiffs have failed to state a RICO claim, the RICO conspiracy claim also falls. *UMB Bank, N.A. v. Guerin*, 89 F.4th 1047, 1057 (8th Cir. 2024) ("To successfully allege conspiracy to violate

---

[18] Plaintiffs raise another argument that appears to mirror certain allegations made by the plaintiffs in *Sheet Metal Workers*. There, the complaint alleged that the PBMs all adopted policies interpreting the usual and customary price of drugs to exclude the lower price that CVS charged to cash-paying individual customers who enrolled in CVS's membership program, and the PBMs did so only because they knew that other PBMs had agreed to do the same. 305 F. Supp. 3d at 341. "This assurance was paramount to the scheme, for if any one PBM had confessed, the health plans would have put a stop to it, insisting that they pay no more than CVS's cash customers in accordance with their contracts with the PBMs." *Id.* Echoing that assertion, here, Plaintiffs argue that their complaint supports an inference that the installers were working together because "if any one of the installers declined to participate in the fraud or revealed the existence of the platform fee, then they and all the other installers would lose out on the monetary benefits that they shared with Dividend." Pls.' Mem. 40. But Plaintiffs do not elaborate on why that result is a plausible inference from the allegations in the Master Complaint. Nor have the pointed to allegations indicating that each of the installers only agreed to keep the platform fee hidden from consumers because they knew other installers were doing the same.

RICO under 18 U.S.C. § 1962(d), UMB must first prove the elements of a RICO violation.")

(cleaned up).

## ORDER

For the reasons set forth above, **IT IS HEREBY ORDERED THAT**

1.  Fifth Third Bank's First Motion to Dismiss (Dkt. 148) is **GRANTED IN PART** and **DENIED IN PART** as set forth herein.

2.  The Motion is **GRANTED** with respect to Class Count Two asserting a violation of RICO under 18 U.S.C. § 1962(c), and Class Count Three asserting a RICO conspiracy claim under 18 U.S.C. § 1962(d).

3.  The Motion is **DENIED** in all other respects.

4.  Because at least some of the broadest claims in this case are moving forward, it is time for discovery to begin. The Court hereby lifts the stay and instructs the parties to contact Magistrate Judge David Schultz to schedule a pretrial conference.

Date: August 22, 2025                                     *s/Katherine Menendez*
                                                                    Katherine Menendez
                                                                    United States District Judge